Filed 10/19/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSE M. SANDOVAL, | D070431 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2014-00012901-CU-PO-CTL) |
| QUALCOMM INCORPORATED, | |
| Defendant and Appellant. | |

APPEALS from a judgment and posttrial orders of the Superior Court of San Diego County, Joan M. Lewis, Judge. Affirmed.

Horvitz & Levy, Stephen E. Norris, Jason R. Litt and Joshua C. McDaniel; Wingert Grebing Brubaker & Juskie, Alan K. Brubaker and Colin H. Walshok for Defendant and Appellant.

Thon Beck Vanni Callahan & Powell and Daniel P. Powell; Esner, Chang & Boyer and Stuart B. Esner for Plaintiff and Appellant.

Plaintiff Jose M. Sandoval was severely burned by an "arc flash" from a live circuit breaker while working with contractor TransPower Testing, Inc., and its principal,

Frank Sharghi (sometimes collectively, TransPower),[1] at a cogeneration plant owned by defendant Qualcomm Incorporated (Qualcomm). The jury returned a special verdict finding that Qualcomm retained control over the safety conditions at the jobsite; that it negligently exercised such control; and that its negligence was a substantial factor in causing Sandoval's harm. The jury found Sandoval's employer, ROS Electrical Supply (ROS), not liable, and apportioned fault as follows: 46 percent to Qualcomm; 45 percent to TransPower; and 9 percent to Sandoval.

Following the verdict, Qualcomm moved for judgment notwithstanding the verdict (JNOV) and for a new trial. The trial court denied the JNOV motion but granted the motion for new trial on the theory the jury had improperly apportioned liability.

Qualcomm appeals from the order denying its JNOV motion, arguing Sandoval failed to proffer any evidence to show that Qualcomm, as the hirer of an independent contractor, "affirmatively contributed" to Sandoval's injury under the "retained control" exception to the general rule that a hirer is not liable for the injuries of an independent contractor's employees or its subcontractors; from the order only partially granting its new trial motion; and from the original judgment. Sandoval appeals from the order granting Qualcomm a new trial on the apportionment of fault issue.

As we explain, we conclude substantial evidence supports the jury's finding that Qualcomm negligently exercised retained control over the safety conditions at the jobsite. We thus conclude the court properly denied Qualcomm's JNOV. We further conclude

---

[1]     Neither TransPower nor Sharghi is a party to this appeal.

the court properly exercised its discretion when, sitting as an independent trier of fact, it granted Qualcomm a limited new trial *only* on the issue of apportionment of fault as between Qualcomm and TransPower.  Affirmed.

FACTUAL BACKGROUND

*The Cogeneration Plant/Switchgear*

To power its facilities, Qualcomm at the time of the accident operated a cogeneration plant at its Morehouse "campus" in San Diego.  The cogeneration plant generates electricity from two sources:  a utility (i.e., San Diego Gas & Electric) and Qualcomm's own on-site gas turbine generator.  Qualcomm used this system, sometimes referred to as a "switchgear," to ensure it had an "[u]ninstructable [p]ower [s]upply"; that is, if the utility supply stopped, Qualcomm had a system in place to ensure its facilities, equipment, and data remained "powered up."  Qualcomm's switchgear was manufactured in 1982.

*Sharghi*

Qualcomm in 2013 was in the process of upgrading its power generation system. As part of that upgrade, Qualcomm hired TransPower, an electrical engineering service company.  Sharghi testified that he began working on the switchgear in 1993, before it was owned by Qualcomm; that he thus was very familiar with the switchgear, as he estimated he had worked on it "hundreds of times" over the years; that beginning in about 2013, TransPower typically was at Qualcomm's facility about two or three times per week, during the upgrade; that Qualcomm's "old" generator could generate electricity at 1200 amps, but that, once installed, its "new" generator could generate electricity at 2000

3

amps; and that TransPower was asked among other things to evaluate whether Qualcomm's breaker system, and in particular the "bus bars," could accommodate 2000 amps that would be generated by the new gas turbine.

Regarding Sandoval, Sharghi testified that they had known each other for 20 years; that Sandoval was "safe" in his work and very reliable; that Sandoval and the company he worked for, ROS, helped TransPower locate certain parts it needed for its customers including Qualcomm, as specified by TransPower; that although Sandoval was not an engineer, he nonetheless understood how "all the components" worked and "what kind of ampacity the equipment can take or not"; and that TransPower thus hired Sandoval for a lot of jobs, including on August 3, 2013, when TransPower inspected Qualcomm's breaker system to determine if it could handle the additional amperage.

TransPower on June 15, 2013, had inspected the bus bars after Qualcomm had shut down, or "de-energized," a portion of the switchgear while moving some cables. Sharghi testified that during the June 15 inspection, he could not determine whether the "bus bar that goes out of the breaker on the bottom of the breaker" could support the additional amperage that would be generated by the upgrade. As a result, Sharghi asked Sandoval to accompany him to Qualcomm's cogeneration plant to look at the bus bars, as this analysis was a "big responsibility" for TransPower because if Sharghi was wrong about the bus bars, the "whole thing" could melt.

Sharghi recalled telling Sandoval during a phone conversation before August 3 that they could safely do an inspection on that particular day because the main cogeneration (or cogen) breaker of the switchgear would be "de-energized." During that

4

same telephone conversation, Sharghi did not tell Sandoval to bring personal protective equipment (PPE) to conduct the inspection. Sharghi testified he always carried his PPE with him, but only used it when a job involved "high voltage stuff" in order to prevent or minimize injury due to arc flash. Sharghi recalled telling Sandoval during this particular phone conversation he would bring PPE and another TransPower employee, George Guadana, who also would be doing the inspection, would also have PPE.

Regarding arc flash, Sharghi testified that electricity is in a copper conduit; that air acts as a partial insulator; and that, when the "electricity gets out of the copper conduit" or there is a "short" or "fault" "somewhere in [a] . . . system downstream," the breaker is "trip[ped] . . . and turns the power off." Sharghi noted electrical engineers used certain software to calculate the "arc flash zones of safety." Once factors such as the size of the conductor and the amount of load that is carried are determined, a computer model provides the "caliber [of] clothing" a person must wear when working around a breaker and the distance that must be kept from the breaker when the system is energized. This information is then printed out and placed on each individual breaker, as it varies from breaker to breaker. Sharghi testified that neither he nor his company had ever worked on energized equipment, even with PPE; and that energized equipment was "inherently dangerous."

On the day of the accident, Sharghi recalled neither he, nor his son Omid Sharghi (Omid), nor Sandoval wore PPE. Sharghi, Omid, and Sandoval drove from Irvine and met TransPower employee Guadana at Qualcomm's campus at about 7:00 a.m. After signing in and a brief discussion, they accompanied three Qualcomm employees to the

5

mezzanine area, where the switchgear was located. Sharghi testified that the 1200-amp "main cogen breaker" already had been unplugged and was resting on the floor; and that the three Qualcomm employees were all dressed in PPE and "were ready to do [the] switching of the power." The three Qualcomm employees then went through what Sharghi described as a "lockout/tagout procedure."

Sharghi testified that he observed the Qualcomm team going through this procedure to ensure "they [didn't] miss anything"; that they pulled, or "racked out," certain breakers and put locks on them; and that the Qualcomm employees told him "everything . . . on the turbine control panel [was] de-energized," after conducting a test using a voltage meter. Sharghi then heard one of the Qualcomm employees say they needed to "transfer all the load" from the cogeneration side to the utility side. Sharghi noted that all three of the Qualcomm employees then left the room. Before doing so, one of them informed Sharghi, "this side is hot, this side is not."

After the Qualcomm employees left, Guadana, while wearing his PPE, removed a panel over the cogen breaker to get to the bus bars, and then retested the bars and confirmed they had been de-energized by the Qualcomm team. Guadana then grounded the breaker using another device to ensure there was no residual "static power." While Guadana performed this task, Sharghi, Omid, and Sandoval stood watching at a safe distance. The TransPower team then proceeded to the front of the cogen breaker, which was de-energized. At some point, however, Sharghi asked Guadana to remove the GF-5 panel, which was *not* de-energized.

6

Sharghi testified that, although he had been able to determine during the June 15 inspection that the line-side bus bars were rated 2000 amps "going to the breaker on the top," on that day he had been unable to see the bus bars on the "bottom part of the breaker," the "load side," and thus, was then unable to determine whether they also were rated 2000 amps and could handle the additional power that would be generated by the new gas turbine. It was precisely for this reason that Sharghi asked Sandoval to join him on August 3 for an additional inspection of the bus bars on the bottom of the breaker. Sharghi noted there were six bus bars in this particular breaker, three for the "line side" and three for the "load side."

Sharghi further testified that there was an "empty cell underneath the breaker." Sandoval physically got inside the lower cabinet but could not see the bus bars because of some plates. Once Guadana removed the plate from the de-energized breaker, Sandoval went back into the cabinet and confirmed the load bus bars were rated 2000 amps. Sharghi stated a 2000-amp bus is about six inches wide, while a 1200-amp bus is about four inches wide. Sharghi felt relieved by their discovery, as it would have been expensive and a "lot of work" to convert the bus bars to 2000 amps. After confirming the amperage of the load side bus bars, Sandoval exited the cabinet, and Sharghi then got inside the cabinet to take some photographs of the bus bars.

Because Sharghi was in the process of preparing a bid for Qualcomm to convert or "retrofit" the system from 1200 to 2000 amps, he asked Sandoval to get some paper from a shelf so Sharghi could list some of the parts they would need. A few seconds later, while Sharghi remained in the cabinet, Sandoval called out to Guadana, asking, "[C]an

7

you help me [with something]?" Sharghi instructed Guadana to go see what Sandoval wanted. A few seconds later, Sharghi heard a "bang" and felt the ground shake, which he immediately recognized was a response to a breaker being tripped.

Sharghi initially thought someone from Qualcomm's control room had purposely tripped the breaker. A few seconds later, however, Sharghi heard Guadana screaming for help. Sharghi testified he and Omid turned a corner and saw Sandoval standing near GF-5 with his shirt on fire. Guadana, standing against a wall, appeared "paralyzed." Sharghi and Omid then pulled Sandoval's shirt off to get the heat away from his body.

Sharghi admitted that when the Qualcomm employees removed the main cogen circuit breaker to allow Sharghi to inspect the load side of the bus bar, the equipment was in an electronically safe condition; that the Qualcomm employees told each of Sharghi's team, including Sandoval, that "other panels were energized and to be cautious"; that the power plant was still operating on utility power while Sharghi and his team inspected the de-energized main cogen cell; that after the Qualcomm employees had left the room, Sharghi directed Guadana, who was wearing his PPE, "to remove the back cover of the main cogen breaker to test and ground the three-phase cogen breaker to ground"; that Sharghi *further* directed Guadana to "remove the adjacent back cover of the GF-5 feeder breaker as [Sharghi] needed to take a picture from the rear of both panels to document [his] report accurately"; that the photograph Sharghi wanted to take was "unrelated to the inspection being performed by Mr. Sandoval at the main cogen breaker"; that Sharghi had the rear covers of the cogen and the GF-5 breakers "removed after Qualcomm personnel left the area and without Qualcomm's knowledge"; that "[n]o reason existed for

8

Mr. Sandoval to inspect, take measurements at or view the GF-5 breaker" that morning; that "Mr. Sandoval's inspection was to be performed in front of the main cogen breaker"; and that Sandoval had completed his inspection of the front of the main cogen breaker and "he was simply asked to make a list of parts that were going to be ordered from ROS . . ., his company, to do the necessary work in this increasing amperage for the Qualcomm switchgear."

Sharghi also testified that he witnessed the Qualcomm employees use their own "hot stick" and voltage meter to test for the absence of electricity in the front of the main cogen cell after they had removed it; that after Qualcomm completed its own testing, Sharghi directed Guadana to confirm independently using TransPower's own "hot stick" and voltage meters "there was no live energy in the main cogen cell to be inspected"; that after the Qualcomm employees removed their PPE and went on to other duties, Sharghi was "left . . . in charge of the inspection," which was to be "limited"; and that in doing that inspection, TransPower did not use any Qualcomm equipment.

Sharghi knew the GF-5 was energized when he asked Guadana to remove the bolted-on panel. Sharghi admitted that he neither asked a Qualcomm employee to remain in the room during the inspection, nor did he believe that such a monitor was necessary, as he "knew what [he was] doing"; that he had not anticipated any Qualcomm employee to remain in the room while his TransPower team inspected the main cogen cell, as planned; and that he had not asked for permission from Qualcomm to inspect GF-5, nor had Qualcomm authorized him to remove the panel on GF-5. Sharghi knew GF-5 was

9

live on August 3 because all the load in the Morehouse campus was then being powered "on the utility side of the bus."

Before the arc flash incident, Sharghi did not tell Sandoval that GF-5 was "hot." Sharghi testified he had no reason to pass this information on to Sandoval because Sharghi did not believe Sandoval had any reason to be near GF-5. Sharghi also did not tell his son Omid or Guadana GF-5 was "hot" because his "focus was to take a picture of GF-5 and the cogen breaker together" for his report. Sharghi stated he wanted to make this report "[b]ecause Qualcomm [had] two more 2000-amp on the system which [was] the sync tie and the utility so I didn't want five years later, three years later, somebody comes out [and] sa[ys], 'We have a problem on that 2000-amp bus here.' [¶] So I wanted to have a picture with my report to prove it, that the only section I work[ed] was this. Nothing else. To clear myself."[2]

The record shows Sharghi was then questioned about his August 9, 2015 postaccident report to Qualcomm. In that report, Sharghi claimed he removed the back panel of GF-5, which was the cell or "cubicle next to the main gas turbine breaker," in order to obtain "another view of the bus bar" because the "bus bar [was] located in an isolated area and [there was] very limited space." Sharghi admitted on the witness stand

---

2    The sync-tie breaker was also de-energized for TransPower's August 3 inspection. The sync-tie was located about four cabinets or cells away from the main cogen breaker, which was the subject of TransPower's limited August 3 inspection. De-energizing the sync-tie prevented power from going into the load side of the breaker. Specifically, because the switchgear had two power sources, the utility side and the generator side, the sync-tie breaker was "what splits the two," as it allowed Qualcomm either to "synchronize" with the utility power or to go "independent with [its] own generators."

10

that this statement was "false," claiming at the time he prepared the report he was "mentally . . . paralyzed" by Sandoval's accident.

On further questioning about this statement, Sharghi stated, "Well, [Mr. Sandoval] was invited to come and look at the load side of the main cogen breaker. That was [the] only thing we want[ed] him over there [*sic*]. Nobody asked him to go to the back" of GF-5. Sharghi then added, "[T]here's—three of us are standing there. When I asked Martin [Sandoval] to get paper, write down what you need as parts, and he took [*sic*] on his own to do something different. Why be responsible for that? [¶] I mean, that action, when you're working in the critical system like that, you're not familiar with the Qualcomm operation or equipments [*sic*] and this and that, as much as I was involved—I didn't even tell my son and George [Guadana] that GF-5 is hot because I didn't want to *scare everybody*. [¶] My point was to snap a picture. When Martin is making the list of parts that he needs, I go back there, take a picture, and I had my PPE to put on and then that's the end of it. I had no clue Martin was on the back. And, besides, the GF-5 buses are 1200. It wasn't to be anything to help us in a situation for the GF-5 for the cogen breaker." (Italics added.)

Sharghi noted his photograph of the back of the GF-5 breaker taken during his June 15 inspection had not come out well. For this reason, he testified *he* decided to take the cover off of GF-5 during the August 3 inspection and photograph the inside to avoid any responsibility downstream, stating: "Well, [the] June inspection, we didn't take the cover off of GF-5 and the camera reflection on the—on the panel, it was just you couldn't see anything. I mean, because of the light above and this and that. [¶] So when second

11

time that I—August the 3rd, I decided to take the cover off and I can—it will be easier for anybody who wants to make a judgment later on, these are related together, because one will show it's 1200 [amps] and the picture shows exactly what it is, and the one that is next to it, separate, they're not separate from each other.  [¶]  So just for my own protection of the—doing a job like that which was very, very high responsibility, if we made one mistake, Qualcomm will lose I don't know how many millions of dollars, the bus bar will melt, and the whole plant will go down so I have to be very cautious and careful."

*Guadana*

Guadana testified that he was employed as an electrical engineer with TransPower on August 3, 2015; that he did not feel qualified to work around energized equipment; and that a few days before the accident, Sharghi informed him that they were going to the Qualcomm campus on August 3 to check the load side of the main cogen breaker and that Guadana would be responsible for opening the main cogen panel once it was de-energized, test it with a volt stick, and ground it.

Guadana testified that on August 3 he knew the cogeneration plant would remain on utility power while TransPower inspected the front side of the main cogen breaker. For safety reasons, he and the TransPower team watched from afar as Qualcomm employees Arthur Bautista, Jason Potter, and Mark Beckelman, Jr., whom Guadana knew as a result of his work at the Qualcomm site, did their "lockout/tagout of the breakers that were supposed to be racked out."  After the Qualcomm team performed the lockout/tagout procedure, Guadana, wearing his PPE, at the request of Sharghi opened

12

the rear panel of the de-energized cogen breaker. The rear panel had a top and bottom panel. Once opened, Guadana used a TransPower volt stick to confirm it was de-energized. He then attached a "grounding cable" as a safety precaution "in case there [was] feedback from accidental energy."

After completing this task, Guadana testified that Sharghi asked him to open the GF-5 panel, which Guadana "assume[d]" was "hot." Based on his training and experience, Guadana always assumed something was "hot" until proven otherwise. Sharghi then did not tell Guadana *why* he wanted the back panel of GF-5 removed. Nor had Sharghi mentioned he wanted the GF-5 panel removed during their telephone conversation a few days earlier, when they had discussed the scope of the August 3 inspection. Although Guadana knew removing the panel to GF-5 was dangerous, he felt protected by his PPE. Even at trial, Guadana could not explain why Sharghi asked him to remove the GF-5 panel from the live circuit.

After removing the GF-5 panel, Guadana went back to the front side of the main cogen breaker and saw Sandoval "physically inside the box" or "cubicle" of the breaker, inspecting it. Sandoval then asked Guadana to remove a panel from the lower box, which Guadana did. After Sandoval went back inside the cubicle, he then announced the "job was done." Guadana testified he next saw Sharghi and later, his son, get into the cubicle and take pictures. As this was taking place, Sandoval called out for Guadana to help him with something from behind the switchgear. Guadana encountered Sandoval at the corner. Sandoval asked Guadana to hold a flashlight for him, and then walked to the back of the main cogen breaker and GF-5. It was then Guadana saw a "flash," a

13

"silhouette of a man in a blue flame," and, after regaining his "composure," Sandoval on fire.

*Redding*

Kirk Redding testified that at the time of the accident, he was the senior facilities manager, and that Brian Higuera was the plant supervisor, of the Qualcomm campus. When Higuera was absent, Qualcomm employee Bautista acted in a supervisory capacity as a plant engineer.

Redding testified that Higuera trained Bautista, Potter, and Beckelman to inform outside vendors what part of the switchgear remained hot and what part was de-energized after the lockout/tagout procedure; that after a lockout/tagout had been performed by a Qualcomm team, Redding believed it was "critical that those persons, outside vendors, who were going to be working on the equipment, be told what's hot and what's not"; that such information was important to reduce or eliminate an arc-flash event; and that "*everybody* who's going to be working on the equipment" should be told what is hot and what is not hot. (Italics added.)

Redding testified he had known Sharghi for about 21 years, as Sharghi over the years had provided engineering service, support, and maintenance to Qualcomm's cogeneration power plants and data locations. Redding considered Sharghi to be Qualcomm's "go-to-guy" in connection with such services and support.

Regarding the GF-5 panel that had been bolted in place, Redding testified Sharghi did not have Qualcomm's permission to remove it. According to Redding, before any portion of the switchgear could be inspected or worked on, a written procedure had to be

14

prepared and approved; opening the GF-5 panel was not part of the written procedure for the August 3 inspection by TransPower. Until the day of Sandoval's accident, Sharghi had never gone beyond the scope of work authorized by Qualcomm.

In early 2012, Qualcomm employees including Higuera, Bautista, and Potter participated in a National Fire Protection Association (NFPA) lockout/tagout training course provided by a third-party vendor. Redding testified this course, as well as a similar course in 2008, lasted a full day and covered such subject matters as lockout/tagout procedures; electrical safety standards including updates to those standards; how to be safe around electrical equipment including the assumption that "electrical equipment has to be proven not to be hot before someone approaches it or inspects it"; and arc-flash issues and boundaries. This same third party also assisted Qualcomm in reviewing and updating its electrical safety programs.

Qualcomm's safety manual, dated January 22, 2013 (i.e., before the August 3 accident), included a discussion of lockout/tagout procedures. Redding testified the manual, which was admitted into evidence, included Qualcomm's policy "that all maintenance and servicing on equipment shall be done with the equipment in a locked-out status"; that because the switchgear had two power sources and a lot of different cells, each time the switchgear was worked on Qualcomm followed its "general lockout/tagout policy" in "conjunction with a customized, step-by-step procedure for whatever the proposed scope of work [was to] create[] the lockout/tagout procedure for a certain proposed inspection or work that [was to] take place"; that Qualcomm followed a step-by-step written procedure for a lockout/tagout because the "configuration change[d]"

15

depending on the scope of work to be done; and that the plant operators and supervisors together created this detailed step-by-step written procedure in advance of the lockout/tagout of breakers. As a result of the 20-plus-year relationship between Sharghi/TransPower and Qualcomm, Redding testified TransPower was aware of, and understood, these policies and protocols of Qualcomm.

On August 1—two days before the accident, Bautista sent an e-mail to Redding and Higuera regarding the step-by-step procedures that would be followed in locking out/tagging out the main cogen breaker for TransPower's August 3 inspection. At the bottom of the e-mail, Bautista stated, "Your thoughts and blessings if this is doable so I can submit an RFC [i.e., request for change]." Redding testified he personally never received a response to this e-mail from Higuera.

According to Redding, if the scope of a project changed, so too would the RFC because the RFC process "ultimately determine[s] what work is authorized." Redding explained this procedure was in place to ensure any changes to the scope of work were vetted beforehand as those changes could impact a business unit, data centers, not to mention raise safety issues. Redding noted the RFC for the limited inspection on August 3 to be done by TransPower did not include opening or inspecting GF-5.

Redding felt "very comfortable" that the August 3 inspection could be done safely without him being on-site. Redding reiterated that it was only an inspection of, and not physical work to, the cogen breaker; that Sharghi and his TransPower company had been working on the switchgear in various capacities for more than 20 years; that Bautista, who at that time had worked for Qualcomm about 15 years, had agreed to participate in

16

the lockout/tagout procedure with Potter, who had worked for Qualcomm for about 10 years, and with Beckelman; that these three Qualcomm employees were very experienced and had done this procedure hundreds of times; and that based on the approved RFC and the limited scope of work, Redding did not believe it was necessary for him to be on-site for the inspection, nor did he have any concerns that the lockout/tagout process could be done safely.

Redding testified that Qualcomm followed its policy on August 3 requiring energized equipment to be "guarded"; that "guarded" meant the equipment was protected by large metal doors that were bolted in place with four bolts; and that to remove those doors required an electrical drill or similar tool.

The day before the inspection, Bautista sent an e-mail to Redding and Higuera providing an update about the weekend work at the plant, including by TransPower. Redding testified he could not recall Higuera commenting on the August 2 e-mail, including providing input that the inspection should not go forward.

*Higuera*

Higuera testified that, at the time of the accident, he was Qualcomm's senior plant engineer who supervised another plant engineer (i.e., Bautista) and eight plant operators (i.e., including Potter and Beckelman). Higuera, in turn, was supervised by Redding. According to Higuera, Redding's responsibilities went beyond the cogeneration plant and included "critical spaces" on the Morehead campus.

As senior plant engineer, Higuera's responsibilities included "anything and everything to do within those four walls of the cogen and anything related to or that was

17

outside of the four walls of the cogen. Supervising employees, contractors." Higuera testified that from time-to-time the switchgear system had to be partially shutdown, including for breaker maintenance. However, Higuera noted shutting down the switchgear for construction was "much different" than for maintenance. According to Higuera, Qualcomm was in the process of making the "[b]iggest upgrade the Building P cogen ha[d] ever seen" when Sandoval was injured.

Higuera confirmed that when work needed to be done on the switchgear, Qualcomm used the "lockout/tagout" procedure. This procedure meant that for an individual to get into the cogeneration room, that individual had a "log" assigned to him or her and a "tag" with his or her picture, which was used to ensure the individual was qualified to be in that room. Without a "lock and tag," Higuera testified a person would not be able to access the room and "touch [the] machine."

Higuera testified that when the switchgear was "inspected," as was the case on August 3 when the accident occurred, it was "definitely" *his* policy that "somebody from Qualcomm be present at all given times when there's a possibility during a live electrical break." However, Higuera added that Qualcomm had no policy, either written or by "custom and habit," requiring a manager or supervisor to be present during such an inspection. Qualcomm also had no policy, again either written or by "custom and habit," informing anyone who would be working on or near the switchgear "what parts of the switchgear [were] off and what parts of the switchgear [were] still hot"; and that he personally was never instructed by Redding to teach Bautista, Potter, or Beckelman "that after they perform a lockout/tagout procedure . . . they shall notify every single person

18

who's going to work on that gear or be near that gear after the lockout/tagout what parts are hot and what parts are not."

On the day of the accident, Higuera was out of town. Higuera testified that before he left town, he was involved in the "process" of "setting up the inspection" so that it could be completed safely. Even though he was out of town, Higuera was still "talking with Mr. Redding and [Higuera's] crew about that inspection."

Higuera testified as follows with respect to whether, in his absence, the August 3 inspection should have gone forward: "My opinion was that the shutdown should wait because of the sheer volume of work. And I'm not so much of what was going on in the switchgear room but the fact that they had—I believe it was two or three other contract[ors] on site where they would have to abandon the switchgear room and go out and [shutdown] the other trades which just to me—usually, you don't have that much work going on and only three people, you know—and I knew there was only going to be three people at the time. [¶] And that's when I said, 'Hey, can you postpone it two weeks. I should be back within two weeks.' Man, it was—from there, [the] decision was made. You know, I gave them my $0.02 about it, I guess, you could say and that was the reason. Just there was—there was a lot more work scheduled that day than I was comfortable with."

On further questioning, Higuera testified he was "concern[ed]" about the August 3 inspection because he was out of town; that he deemed it "prudent" to have a Qualcomm employee in the switchgear room "to be sure only the scope of work is done and done in a safe manner"; that because of the "volume of people and the trades" that were going to

19

be on-site on August 3, he did not believe that Bautista, Potter, and Beckelman would be "enough to handle the situation"; and that he "knew" three people "couldn't cover the shutdown."

Higuera testified he expressed these concerns to Redding before he left town. Redding in turn checked with others on the team who would be responsible for shutting down the main cogen breaker and was told they were comfortable going forward in Higuera's absence. Higuera concluded that, while "they were comfortable doing their jobs," that did not mean they could do his job, which was "supposed to be in the— overseeing certain portions of it." Higuera added: "And even then, if they were—they know if there [were] four of them and even another operator, that you stay here. You're—you look after this portion of the work, what's going on, and what work is being done."

Higuera testified he was under the impression that Redding would be present during the August 3 inspection in a "supervisory role." Higuera testified that while the three Qualcomm employees did "exactly what they were supposed to for their job[s]," they "didn't do [his]."

*Beckelman*

Beckelman testified that he was employed by Qualcomm as a plant operator on the day of Sandoval's accident. At the time of the accident, Qualcomm was in the process of "replacing antiquated equipment and upgrading the generation process"; that he was part of the "kickoff team" in planning this upgrade, which was a large project as it consisted of replacing turbines that were "gross polluters" and also re-piping the plant; and that to

20

accommodate the new gas turbine generator, Qualcomm needed to upgrade its "old switchgear."

Beckelman recalled the planning for the August 3 shutdown began about two months earlier, as the shutdown involved "a long list of paperwork." Before the scheduled shutdown, Beckelman participated in a conference call with Higuera and Redding in which they discussed Higuera being out of town on August 3.

Beckelman recalled during this call that Higuera expressed "reservations" about the shutdown going forward and suggested the inspection be conducted when he returned.[3] Beckelman further testified that Redding did not believe there was any reason to postpone the shutdown, as Redding was "confident in [the] team," believed Qualcomm "could carry [the shutdown] out," and said "he [i.e., Redding] would be on[-]site that day." Redding, however, did not arrive at Qualcomm's campus until after Sandoval's accident.

Beckelman testified Bautista typically did not work on Saturdays but had come in on August 3 to help him and Potter do the lockout/tagout procedure. Beckelman knew Sharghi and his company TransPower, as they often were working at the cogeneration plant performing inspections and maintenance. Beckelman also had met Sandoval through Sharghi a few times before the accident.

Beckelman stated he got to work at about 5:00 a.m. on August 3 because he had a "lot on [his] plate" that day. In addition to the lockout/tagout for TransPower's

_____

3    As noted *ante*, Redding could not recall having such a meeting or conversation with Higuera and/or Beckelman before the accident.

inspection, Beckelman was slated to assist a contractor with the inspection of the turbine itself; another contractor with the hot water shutdown "for a piping reconfiguration"; and yet another contractor with work on the cooling towers. Beckelman estimated there were about 15 people from various vendors or trades at Qualcomm's campus that day.

Beckelman testified that Sharghi, Omid, Sandoval, and Guadana arrived at Qualcomm at about 7:00 a.m., as scheduled; that they brought all the vendors—including TransPower—into the control room and did a mandatory safety briefing, outlining "who was going to be working where," the scope of work each vendor would be performing, and what to do in case of an emergency. During the safety briefing, the Qualcomm team discussed with the TransPower team—including Sandoval—the "scope of work, what panels [the Qualcomm team] would be locking out, . . . what panels [they] were not going to lock out . . . [and] what panels [they] were going to remove breakers from. So [they] got into the specifics of what [their] evolution [was] going to be." Beckelman reiterated they went through this detail with the TransPower team to "make sure [they] we're [*sic*] not missing anything."

Although the Qualcomm team did not identify during the safety briefing which panels would remain energized, they specifically told the TransPower team—again including Sandoval—that "there [were] other energized panels . . . and that [TransPower was] only to work on the panels that are isolated and confirmed safed off." Also during the briefing, Beckelman and his team specifically told the TransPower team not to "open anything." Once the briefing was done, the three Qualcomm employees got into their PPE for the lockout/tagout procedure.

22

Before performing the lockout/tagout procedure that day, Beckelman testified he, Bautista, and Potter had done "walk-throughs," or "kind of a dry[]run of what [they] were going to do," to ensure they were all on the same page and understood each other's responsibilities in case something happened. Beckelman noted it was important to prepare in advance for the shutdown because of the "voltages and amperages" involved. Also, before they did the lockout/tagout on August 3, they did a more in-depth safety briefing, which included "who [they] need[ed] to have in the room, who need[ed] to witness that"; and they then selected "door guards," who kept out those people who did not need to be in the room.

The record shows after the three Qualcomm employees finished the lockout/tagout procedure on the main generation breaker, a process Beckelman described in detail, Guadana then applied the grounding cable to the breaker. Once completed, Beckelman then checked the cables to make sure they were properly installed. Beckelman then made sure that "everyone in the space [was] satisfied with the voltage testing procedure and everyone [felt] that it [was] safe to proceed." To accomplish this task, Beckelman spoke with Sharghi and confirmed Sharghi was satisfied that the voltage had been properly checked; that the "proximity sensor was working correctly"; and that the "grounds were installed correctly."[4]

---

4     We note Beckelman's testimony regarding "who did what" after the lockout/tagout procedure had been completed varied somewhat from the testimony of Guadana and Sharghi.

Beckelman also told Sharghi "where the safe zone" was and "where the no-safe zone was." In connection with this latter information, Beckelman testified he used his "hand in the front of the switchgear to create a delineation of where there [was] no voltage present and where there [would] be voltage present." Even after this conversation and demonstration, Beckelman testified he "made sure" Sharghi "understood where the safe area was." During this conversation and demonstration with Sharghi, Beckelman could not recall where Sandoval was standing. Beckelman, however, testified he had "no doubt" that he communicated this information to Sharghi, as it was "very easy to lose your place" in the switchgear when looking at the machine from the backside, describing it as a "sea of sameness."

Even though Beckelman had other duties that morning, he testified his job with respect to TransPower was not done after the lockout/tagout procedure had been safely completed, as he intended on returning to the switchgear room to ensure "things [were] getting done" and to see if TransPower needed "further assistance." Beckelman left the cogeneration room just short of 8:00 a.m. that morning to take "plant readings," which was done on "even hours." At 8:09 a.m., while in the control room Beckelman heard a "loud bang and a lot of alarms going off." After checking the "telemetry," Beckelman determined the problem had not occurred on the utility side, but noticed the voltage had dropped and then had been restored. He then headed up to the room to "get TransPower out of the switchgear so [he] could take remedial action."

After exiting the control room, Beckelman encountered Bautista. They began jogging upstairs to the switchgear. While on their way, they encountered a representative

24

from a third-party vendor, who stated the "electrician [was] on fire." Beckelman told Bautista to call 911, asked the representative to grab the automatic electronic defibrillator, and then in a full sprint, went upstairs to the switchgear.

On entering the room, Beckelman noted a "[h]eavy smell of ozone," saw a lot of smoke, and came upon Guadana, who appeared to be in shock. After rounding the edge of the gear, Beckelman saw Sandoval, who was "smoldering." As he got closer, Beckelman saw Sandoval's subcutaneous fat "had saponified," or melted and turned liquid. Sandoval's skin came off in Beckelman's hands as Beckelman attempted to treat Sandoval. Sandoval kept repeating, "Why was it live," "It shouldn't be live." Although badly burned from his head to his waistline, Beckelman observed Sandoval was oriented.

As they waited for paramedics to arrive, Beckelman saw smoke coming out of GF-5, which was "outside of [the] safe zone." Beckelman saw the panel to GF-5 had been removed and was leaning against the breaker next to it. Beckelman immediately instructed another contractor to "close that switchgear as quickly as possible and to safe off any other panels, get them closed." Beckelman then coordinated the medical evacuation of Sandoval.

Beckelman testified he was "surprise[d]" to see the panel to GF-5 off that day, as that was "not in the scope of work" and was "outside the zone of safety that [they] had created." Beckelman further testified that he had "no idea how or why that panel" from GF-5 had been removed, and that, when he left the mezzanine level, the switchgear was in an electronically safe condition, such that "anyone wearing civilian clothing could put [their] hands on any aspect of this gear because it was all protected by the steel cabinet

25

enclosures in place," with the exception of the "limited scope inspection area, the main cogen cell," which had been de-energized.

Beckelman testified that he and his team performed their work "methodically and safely" in de-energizing a portion of the switchgear in connection with TransPower's August 3 inspection of the main cogen breaker; that the pre-planning and walk-throughs before, and the lockout/tagout procedure on, August 3, "created a safe environment to do the inspection"; that he was "confident" the TransPower team—including Sandoval— witnessed the lockout/tagout work completed by him and the Qualcomm team; and that when he returned to the operation center just before 8:00 a.m. that day, "there was no question in [his] mind that the gear was in an electronically safe condition" for the limited inspection to go forward.

Beckelman confirmed that TransPower—including Sharghi—never asked him or any member of his team for permission to inspect the GF-5 breaker on August 3; that TransPower never asked him or the Qualcomm team to de-energize GF-5; that TransPower never asked him or his team for permission to remove the GF-5 cover; that TransPower never asked him or any member of his team to stay and monitor TransPower's inspection of the main cogen breaker; that neither he nor his team directed TransPower on how to conduct the limited inspection of the main cogen breaker; and that he and his team were aware that at the time of the accident, Sharghi had been providing "services, maintenance, monitoring inspection . . . for a couple of decades at that Qualcomm plant," and thus, he considered TransPower "highly competent" to inspect the switchgear in a safe manner. Beckelman noted that although he had other duties that

26

morning, he did not believe it was necessary for him or a team member to monitor TransPower's inspection because exposing "extraneous personnel" to a space where "electrical work" is being conducted was not recommended.

*Potter*

Potter testified he received no training from Qualcomm regarding a policy requiring outside vendors working on the switchgear to wear PPE. Nor did he receive any training from Qualcomm that required him or his team to tell "all outside vendors . . . what remain[ed] energized after the lockout/tagout" procedure was completed, or that required a Qualcomm supervisor, such as Higuera or Bautista, to remain in the switchgear room to ensure the work was performed in a safe manner.

On the day of the accident, Potter recalled they performed the lockout/tagout procedure in their PPE, but unlike Beckelman, he could not recall specific details about that process. Potter, however, confirmed that once the lockout/tagout procedure had been completed, TransPower could safely inspect the main cogen breaker; that anything which remained live or "hot" was protected by the bolted-in-place steel panels in front of each of the breakers; and that when he and the Qualcomm team left the mezzanine and returned to the control room, there was "no exposure to live electricity." Potter also confirmed the Qualcomm team had additional duties that day other than the lockout/tagout procedure for the TransPower inspection.

While in the control room, Potter heard a "loud sound," saw the lights "flicker[]," and observed the plant equipment "changing state." Next, alarms started sounding. When he, Bautista, and Beckelman left the control room to find out what had happened, a

27

representative from a third-party vendor informed them of the accident. While Beckelman went to assist Sandoval, Potter stayed downstairs and called 911. At one point, he went upstairs to assess the situation and passed that information on to the 911 operator.

Potter recalled that TransPower's inspection on August 3 was to be limited to the main cogen panel, which had been "isolated and grounded." Like Beckelman, Potter confirmed that TransPower's inspection did not include GF-5; that Sharghi never indicated to him or the Qualcomm team that Sharghi intended to take the cover off of GF-5 or to inspect it; that Sharghi did not ask him or another member of the Qualcomm team to monitor TransPower's inspection of the main cogen breaker; that Sharghi knew the switchgear better than anyone and also knew the busing was live; and that neither he nor any other member of the Qualcomm team directed TransPower on how to conduct the inspection of the main cogen breaker.

*Sandoval*

Sandoval testified that at the time of the accident, he had been in the "electrical business" for about 20 years, including as a "breaker technician"; that the company he worked for specialized in upgrading and reconditioning circuit breakers, selling new and used equipment, and had a "switchgear division," which at one point he managed; that although he managed this division, his role was to assemble and test parts called for by an engineer, as he himself was not an engineer; and that he met Sharghi in the late 1990's, as Sharghi used to purchase parts from Sandoval's employer.

Sandoval recalled talking with Sharghi about the inspection at the Qualcomm campus about a month before the August 3 accident. A few days before August 3, Sandoval and Sharghi had another conversation in which Sharghi informed Sandoval that Qualcomm would be shutting down its switchgear, which would allow TransPower to conduct an inspection of certain equipment. During this call, Sandoval was not told to bring his PPE or otherwise advised about any safety precautions they would have to undertake to conduct the inspection. Sharghi also did not provide Sandoval with any specifics regarding the shutdown.

On the day of the accident, Sandoval, Sharghi, and Omid met Guadana at the Qualcomm campus. Sandoval could not recall participating in any safety meeting before they went upstairs to the mezzanine, where the switchgear was located. Once upstairs, Sandoval recalled at least two Qualcomm employees, who were wearing PPE, told the TransPower team they were going to rack out the breaker and to stay back. Sandoval saw the Qualcomm employees rack out the cogen breaker and place it on the floor.

Sandoval testified neither Sharghi, nor Omid, nor Guadana, nor any of the Qualcomm employees said anything about what remained "hot" after the lockout/tagout process had been completed. Sandoval's "mindset" then was that the entire switchgear had been de-energized. He had no recollection of anyone from Qualcomm informing him that a portion of the switchgear remained live; of anyone from TransPower saying the inspection of the main cogen breaker had been completed because they could see the bus bars were 2000 amps; or of Sharghi asking him to get a piece of paper and pencil so they could write down the parts that would be needed to upgrade the main cogen cell (other

than the bus bars). Nor could Sandoval recall asking Sharghi if he could go to the back of the switchgear to look at the bus bars or seeing the cover of GF-5 removed.

Sandoval testified Guadana removed the top panel to the main cogen breaker that had been racked out. They all then moved to the front of the main cogen breaker. At this point, nobody had told Sandoval that the utility line side of the switchgear was still live. After doing a preliminary inspection of the de-energized main cogen breaker, Sandoval asked Guadana to remove a panel inside the breaker, which he did. Sandoval testified he could see some of the bus bars, but claimed he could not see their sizes. He thus told Guadana he wanted to take a look from the back.

Sandoval testified he made this statement in front of Sharghi, who was busy talking to his son Omid. Sandoval, holding a flashlight and tape measure, then handed the flashlight to Guadana, proceeded to the back of the switchgear, and approached what he described as an "open cabinet." At that point, Sandoval saw everything turn "blue" and then he started screaming.

*Avrit*

Sandoval's expert Brad Avrit testified he was president of a construction management and safety consulting company that provided "forensic engineering" services, which included reconstructing events after an accident to determine how the accident had happened and whether proper policies and procedures had been followed. To conduct this analysis, Avrit used codes and regulations, industry standards, and what the owner of a facility did because typically such an owner "has even more specific requirements that need to be met for [its] own facility['s] safety."

30

Avrit opined that Sharghi's negligence in ordering the removal of the back panel of GF-5 was a violation of safety standards; that Sharghi's failure to erect a barricade around energized GF-5 was a further violation of safety standards; and that these violations were a substantial factor in causing Sandoval's injury. Avrit further opined that before Sharghi ordered the panel removed, he should have informed Qualcomm.

Regarding Guadana, Avrit opined he was negligent in removing the cover of GF-5, in also not placing a barricade around GF-5, and in not warning Sandoval that GF-5 was energized. Regarding the latter point, Avrit noted Guadana held a flashlight given to him by Sandoval just before the arc flash, which light Guadana was shining into GF-5 as Sandoval approached the cell holding a metal tape measure.

Regarding Qualcomm, Avrit opined that it did not follow its own policies in three respects. First, he opined Qualcomm failed to supervise the work in the electrical room "to ensure that only the work that is specified that is going to be done is done and that none of the other equipment is tampered with, used, modified, or exposed in any way" because some of the equipment was still live. In reaching this opinion, Avrit relied on the testimony of Higuera. Avrit concluded Qualcomm's failure to adhere to this policy was a substantial factor in causing Sandoval's injury, which he believed was entirely preventable.

Second, Avrit opined Qualcomm failed to follow its policy of "making sure anybody that was going to be doing work in that room, that it was clearly identified to them what areas were energized and [what] areas were not energized, and there's no confirmation that that information [was received by] Mr. Sandoval . . . that he did not

31

recognize or realize what was energized and what was not energized." To support this second opinion, Avrit relied on Redding's testimony that "it was the responsibility of Qualcomm to tell everybody who was going to be working on that switchgear what remains hot and what is not."

Avrit noted a member of the Qualcomm team should have met with each person on the morning of August 3 and specifically identified what was and was not energized. In addition, he noted Qualcomm should have used signage to highlight further this same information, because the mezzanine was a "big room with a lot of equipment that looks very similar, one piece of equipment to the other." According to Avrit, such signage, which costs a "couple bucks" and had a magnetic back, could easily have been attached directly to the equipment to identify what was on and what was off.

Third, Avrit opined Qualcomm failed to follow its own policy of requiring outside vendors working on the switchgear to wear PPE, particularly when a person such as Sandoval is working in a room where there is both live and de-energized equipment. As before, he further opined the violation of this policy was a substantial factor in causing Sandoval's injury.

Avrit testified Qualcomm also failed to follow industry standards, including under NFPA. Under NFPA, if there is "look-alike equipment" (i.e., equipment that looks similar from the front and back and/or from one piece to another), and some of that equipment remains energized, then according to Avrit the standard at a minimum required one of three things, or a combination thereof: provide clear safety signs indicating the equipment that is energized; erect a barricade of some sort indicating the

32

equipment to avoid; or have an attendant remain in the room making sure nobody enters the area of the energized equipment.

*Loud*

Qualcomm's expert, John Loud, reached three main conclusions in this case: first, that the cause of the accident stemmed from Guadana's removal of the GF-5 cover, as instructed by Sharghi, which in turn "created a hazard that did not exist previously," and which "was in violation of all standards and all accepted good practices." Second, that "there [was] nothing that Qualcomm did or did not do that caused or contributed to this accident," inasmuch as when Qualcomm finished the lockout/tagout procedure on the main cogen breaker, "it was in an electronically safe work condition" allowing the switchgear to be touched with "bare hands," as any portion of the switchgear that remained energized was covered by steel doors or panels.

And third, that Qualcomm properly passed control of the switchgear inspection "to its qualified contractor, and that was TransPower, Mr. Frank Sharghi," as it was customary for a business such as Qualcomm to hire an electrical engineer such as Sharghi and his company to work on the switchgear and to delegate the responsibility to do so safely to the contractor, particularly in the instant case given Sharghi's familiarity with this equipment.

Loud relied on NFPA 70E, including the 2012 edition, to support his opinions. Specifically, he relied on section 110.1A, which provided: "The host employer [i.e., Qualcomm] shall inform contractor employers [i.e., TransPower] of the following: Known hazards that are covered by the standard and that are related to the contract

33

employer's work." Loud noted this section meant that, if Qualcomm were bringing in TransPower to do an inspection and Qualcomm was "aware of hazards, [it] need[ed] to say that there's energized equipment here, and [it] need[ed] to explain to [TransPower] the lockout/tagout that [it's] doing and how [it's] going to be doing [its] work and how to make sure that the hazards are communicated." Loud opined Qualcomm in this case did exactly that.

Next, Loud relied on section 110.1B of NFPA 70E, entitled "Contract Employer Responsibilities." This section provided: "The contract employer [i.e., TransPower] shall ensure that each of [its] employees is instructed in the hazards communicated to the contract employer by the host employer." Loud opined this section required Sharghi/TransPower "to take the information that was received in the communication from the host employer and make sure that each and every employee is told about the hazards so that they can safely do their work."

In this case, Loud noted there was testimony about a safety meeting before the Qualcomm and TransPower teams went upstairs to the switchgear room. During that safety meeting, Qualcomm communicated that the switchgear was a "live plant"; that it "would be de-energizing a very specific piece of equipment for inspection but that other parts remained energized"; and that both teams then went upstairs and the TransPower team observed the Qualcomm team execute the lockout/tagout procedure, as required by the standard. Loud noted that Qualcomm also communicated the fact that parts of the switchgear remained live—even after the main cogen breaker was racked and locked out/tagged out—"by the presence or the absence of covers. The steel covers tell the story

34

because if it's covered, it's not safe.  If it's exposed, it's de-energized, and it was verified to be de-energized so everything was in an electrically safe work condition."

Loud had no criticism of Qualcomm's logout/tagout procedure on August 3.  He was, however, critical of Sharghi's decision to remove the metal cover from GF-5, noting: "Qualcomm had no information [about opening GF-5].  They were never told about it. Mr. Sharghi testified that he just decided to do it.  He never informed Qualcomm.  And, in fact, he didn't tell anybody.  He just decided to do—to take a picture, as I understand it. But Qualcomm never knew about that, no."

Loud noted that if TransPower wanted to inspect GF-5 that day, GF-5 would have had to been de-energized first, as there was "no justification for inspecting it energized." To de-energize it "was not a big deal" according to Loud, but Qualcomm would have had to include GF-5 in its "plan" and then have done a lockout/tagout procedure on the GF-5 cubicle, as was done on the other breakers to allow for the inspection of the main cogen breaker.

Even if, for whatever reason, TransPower had wanted to inspect GF-5 while energized, then according to Loud Annex J of NFPA 70E required there be an "energized electrical work permit."  To obtain this permit would have required the "manufactured manager's approval, the safety manager's approval, the general manager's approval, the maintenance engineering manager's approval, and then the electrically knowledgeable person's approval," or "five different signatures that you have to get before you're allowed to do energized work because it's hazardous and you want everybody to say . . . the risks are justified."

According to Loud, Article 130 of NFPA 70E required TransPower to invoke "alerting techniques" once Guadana removed the GF-5 metal cover and exposed others to an electrical hazard. This would include putting up safety signs, or a barricade, or having an attendant stand watch to ensure nobody got near the live breaker. Loud opined these requirements did not apply to Qualcomm, however, because "[t]here was no electrical hazard when they finished their lockout/tagout. Article 130 is specifically targeted for energized work. There was no energized work when Qualcomm left" the mezzanine.

Loud disagreed with Avrit's testimony that Qualcomm had an obligation to oversee TransPower's inspection of the main cogen breaker on August 3. Loud noted that was "not standard practice." Loud testified neither OSHA nor Cal/OSHA required a hirer to observe a contractor, noting: "If you're hiring a contractor, it's because . . . they have specialized skills and knowledge and you don't, which is why you're hiring them. And, therefore, they should be allowed to get their work done and that you can transfer responsibility for the work that they're doing and they will take it and run with that."

Loud opined Qualcomm did not "retain control" over the inspection of the main cogen breaker, as opposed to the switchgear itself, on August 3. In his view, Qualcomm transferred that control to TransPower. Loud explained, "[Qualcomm] put it into an electronically safe work condition, they finished their lockout/tagout, and they transferred control for the inspection of that equipment to their qualified contractor, Mr. Frank Sharghi and TransPower." In further support of his opinion, Loud noted that Qualcomm had no control over what TransPower was doing in connection with its inspection of the cogen breaker; that TransPower never asked Qualcomm to monitor that inspection; that

36

TransPower never asked Qualcomm for "input" regarding the "specifics" of the inspection; and that the scope of work that day really involved a "simple inspection" of de-energized equipment.

Regarding Avrit's testimony that Qualcomm should have insisted that Sandoval wear PPE on August 3, Loud testified that made no sense: "It's not required under NFPA 70E. The whole idea is that you're preparing the equipment for somebody who's not a qualified worker, not a qualified person, so that anybody can do the work and you put it into an electronically safe work condition. There is no requirement to have PPE."

Loud also disagreed with Avrit's testimony that the switchgear was not properly labeled. Loud noted the switchgear had permanent warning labels attached to the equipment and that such labeling met "all applicable standards." Loud rejected Avrit's testimony that Qualcomm should have placed a "magnetic warning label" on GF-5, noting doing so "would provide no additional information. If you had . . . labels on the equipment, all the covers that are in place tell you, if there's a cover, it's not safe. If it's exposed, it's safe. That would be—that was the planned work. [¶] And, in fact, it wouldn't have provided any information whatsoever to Mr. Sharghi because he knew GF-5 was energized. When he took the cover off, it wasn't a mistake. He intentionally removed that cover knowing that it was energized behind that. [¶] So what good would a label have done on the GF-5 cover? You tell Mr. Sharghi, [']Oh, by the way, this is energized?['] He already knew that. [¶] So the label would have told him nothing. He acted because he made a decision, a bad one, but he made a decision with information knowing the hazard that was there."

37

Loud opined that after the lockout/tagout procedure, for purposes of NFPA 70E Qualcomm properly communicated "what was hot and what was not" hot. Qualcomm did so through Beckelman, who testified he used his hand to show "them" this information on the actual switchgear. Loud further opined that it was Sharghi's responsibility to inform his TransPower team—including Sandoval—what was energized and what was not; and that the Qualcomm team's removal of the covers from the equipment that was de-energized, while the rest of the energized breakers remained covered by the metal doors, was another "form[] of communication," noting "[a]nything that had a cover was not confirmed safe."

Loud concluded that Sandoval did not adhere to the requirement in NFPA 70E of being attentive during the lockout/tagout procedure of the main cogen breaker. Loud explained this requirement existed because it communicated to a person what equipment was safe to work on and what equipment was not safe, noting that if the equipment was not locked out/tagged out, then a person "shouldn't be touching it." Loud also concluded Sandoval did not fulfill the duty imposed by NFPA 70E to confirm GF-5 was de-energized before he approached the breaker. In support of this conclusion, Loud found Sandoval's testimony that he did not see GF-5 locked out/tagged out "significant" because without that knowledge, Sandoval could not verify the breaker was de-energized and, thus, should not have approached it.

## PROCEDURAL BACKGROUND

Sandoval sued Qualcomm, TransPower, and his employer, ROS, which did not have worker's compensation insurance. Qualcomm moved for summary judgment based

38

on *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*) and its progeny, which bars a contractor's employee from suing a hirer on either a direct or vicarious liability theory. In denying summary judgment, the court found a triable issue of material fact regarding whether Qualcomm "affirmatively contributed" to Sandoval's injury. Affirmative contribution is part of the test under the "retained control" exception to the *Privette* doctrine, as discussed by the high court in *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 (*Hooker*) and *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219.

Both shortly before, and during, trial, Qualcomm proposed several special jury instructions on the issue of whether Qualcomm "affirmatively contributed" to Sandoval's injury. The court, however, refused to give these special instructions, noting they used language that was not included in the standard Judicial Council of California Jury Instruction (CACI) No. 1009B, as discussed in the Directions for Use part of the instruction, and they were, in any event, argumentative.

Based on CACI No. 1009A and its reading of *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, the court at the same time noted it intended to instruct the jury that Qualcomm had no duty to warn Sandoval of a dangerous condition when that condition was known to TransPower. As a result, Sandoval withdrew his failure to warn claim against Qualcomm.

At or near the conclusion of testimony, Qualcomm moved for nonsuit based on *Privette* and its progeny. Qualcomm argued that under this line of cases, plaintiff's claims failed as a matter of law based on the following undisputed facts: "1. Qualcomm

39

hired Transpower, a qualified electrical contractor, to inspect components in the co-generation main cell in the mezzanine room of Building P on the Qualcomm campus. [¶] 2. The scope of work did not include opening or de-energizing a component known as GF-5. [¶] 3. Transpower's principal (Frank Sharghi) did not request that Qualcomm open or deenergize GF-5. [¶] 4. Sharghi admits that opening GF-5 was beyond the scope of work. He admits that Qualcomm did not authorize the removal of the GF-5 panel by anyone, including Sharghi and his employee George Guadana. [¶] 5. Sharghi admits that Qualcomm told him parts of the plant were energized and that he was personally aware that GF-5 was energized. [¶] 6. Sharghi admits that he ordered Guadana to open GF-5, knowing it was a live circuit and knowing it was dangerous. Sharghi admits that Qualcomm was unaware of this. [¶] 7. Sharghi admits that Qualcomm did not control the manner in which he did his work, did not instruct him how to do his inspection, and did not control safety conditions. [¶] 8. Qualcomm did not promise Sharghi it would supervise the job; and Sharghi testified he did not ask for, expect, or need Qualcomm's supervision. [¶] 9. Qualcomm did not promise Sharghi it would provide [PPE] for Sandoval nor did Qualcomm direct Sharghi not to let his employees and agents wear PPE. [¶] 10. PPE is not required by any code or regulation, nor is it common in industry practice, for an inspection of de-energized equipment."

The court denied the motion. In so doing, the court noted there was sufficient evidence, including from the experts, to allow the case to go to the jury.

As noted *ante*, the jury found that Qualcomm retained control over safety conditions of the worksite, that it negligently exercised that control, and that its

40

negligence was a substantial factor in causing Sandoval's injury. The jury awarded Sandoval $1,094,003.42 in economic damages (i.e., past and future medical expenses) and $6 million in noneconomic damages. As also noted *ante*, the jury assigned 46 percent fault to Qualcomm, 45 percent fault to TransPower, and 9 percent fault to Sandoval.

As already noted, Qualcomm moved for JNOV and for a new trial. Although the court denied JNOV, it granted a new trial limited to the jury's allocation of fault, relying on Code of Civil Procedure section 657, subdivision (5), which is limited to "[e]xcessive or inadequate damages." In so doing, the court relied on the evidence showing that even though the main cogen cell had been shut down via the lockout/tagout procedure, Sharghi on behalf of TransPower knew other parts of the cogeneration plant remained live, including GF-5.

As discussed in more detail *post*, in granting a new trial limited to the issue of apportionment of fault, the court found that Sharghi knew GF-5 was energized when he instructed his employee Guadana to remove the panel; that Sharghi removed the panel without authorization from Qualcomm; that Qualcomm could not have known Sharghi intended to remove the panel and expose others to a live cell; that Sharghi's only purpose in removing the GF-5 panel was to take a picture because he ostensibly was worried about future liability; that Sharghi never informed Sandoval a live circuit had been exposed, in disregard of industry standards; that even though Guadana knew GF-5 was live, he never informed Sandoval of such, even as Guadana shone a flashlight on the electrified bus bars as Sandoval approached GF-5 holding a metal tape measure; and that

41

Qualcomm relied on Sharghi, who had worked on the switchgear "hundreds of times" for more than two decades, to stay within the scope of the work approved by Qualcomm.

DISCUSSION

I

QUALCOMM'S APPEAL

A. *Additional Background*

As noted *ante*, Qualcomm requested the court modify CACI No. 1009B to require the jury to resolve whether Qualcomm "affirmatively contributed" to Sandoval's injuries. Specifically, Qualcomm requested the following instruction be given regarding liability to employees or subcontractors of an independent contractor for unsafe conditions under the "retained control" exception to *Privette*:

"Martin Sandoval claims that he was harmed by an unsafe condition while working on Qualcomm's property. To establish this claim, Martin Sandoval must prove all of the following: [¶] 1. That Qualcomm owned the property; [¶] 2. That Qualcomm retained control over safety conditions at the worksite; [¶] 3. That Qualcomm negligently exercised its retained control over safety conditions; [¶] 4. *That Qualcomm's negligence affirmatively contributed to an unsafe condition*; [¶] 5. That Martin Sandoval was harmed; and [¶] 6. That Qualcomm's negligent exercise of its retained control over safety conditions was a substantial factor in causing Martin Sandoval's harm.

"*Affirmative contribution occurs where the hirer (here, Qualcomm) is actively involved in, or asserts control over, the manner of performance of the contracted work. Such an assertion of control occurs, for example, when the hirer directs that the*

42

*contracted work be done by use of a certain mode or otherwise interferes with the means and methods by which the work is to be accomplished. Likewise, if the hirer promises to undertake a particular safety measure, the hirer's negligent failure to do so constitutes affirmative contribution.*" (Italics added.)

The court instead gave CACI No. 1009B without the italicized language *ante*, instructing the jury as follows:

"Martin Sandoval claims that he was harmed by an unsafe condition while employed by ROS Electrical and working on Qualcomm's property. To establish this claim, Martin Sandoval must prove all of the following: [¶] 1. That Qualcomm owned the property; [¶] 2. That Qualcomm retained control over safety conditions at the worksite; [¶] 3. That Qualcomm negligently exercised its retained control over safety conditions concerning the main co-gen cabinet inspection; [¶] 4. That Martin Sandoval was harmed; and [¶] 5. That Qualcomm's negligent exercise of its retained control over safety conditions was a substantial factor in causing Martin Sandoval's harm."

Because the jury was not required to find Qualcomm's alleged negligence "actively contributed" to Sandoval's injury, and because Qualcomm on appeal claims there was no such substantial evidence, it argues it cannot be liable to Sandoval as a matter of law.

B. *Guiding Principles*

" 'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] . . . As in the

43

trial court, the standard of review [on appeal] is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion.' (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)" (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770 (*Cabral*); *IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639 [noting the denial of a JNOV motion "is essentially the same as appealing the judgment itself for a lack of substantial evidence"].)

Moreover, a "party is entitled upon request to correct, nonargumentative instructions in every theory of the case advanced by [the party] which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) However, " '[i]nstructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law. [Citations.] Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition. [Citations.]' [Citation.] Finally, '[e]rror cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given.' " (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359–360; see also *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 593-594 (*Regalado*).)

In addition, a court is "not required to instruct in the specific words requested by a party so long as the jury is adequately instructed on the applicable law." (*Traxler v. Varady* (1993) 12 Cal.App.4th 1321, 1332 (*Traxler*).) As a court of review, [w]e

44

independently review claims of instructional error viewing the evidence in the light most favorable to the appellant." (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.)

Our opinion in *Regalado* informs our analysis on this issue. There, defendant homeowner, himself a licensed concrete subcontractor, wanted to build his dream home. Acting as the owner-builder for the project, he obtained the permits for the construction, served as the person responsible for the job, much like a general contractor, and was at the job site daily. The defendant hired a pool contractor to build a pool and spa at his home. The defendant wanted the pool heater installed underground to reduce noise. The defendant obtained a pre-engineered concrete vault that he then buried in the ground. Because the defendant's property did not have natural gas service, he hired a plumbing subcontractor to run propane lines, including to the location of the proposed pool heater. (*Regalado*, *supra*, 3 Cal.App.5th at p. 587.)

About a year after the vault was installed, the defendant in *Regalado* hired a different pool contractor and requested the pool equipment be installed in the underground vault. The defendant then did not know that placing a propane-fueled heater underground was dangerous. The pool contractor purchased the natural gas heater and converted it to propane, using a kit. The pool contractor also designed the layout of the equipment to fit inside the vault, including where the propane line would enter the vault and where to place the joint for purging air out of the propane line before starting the heater. Although the defendant as owner-builder was responsible for obtaining all permits, he did not obtain separate permits for the vault and propane line or have the

45

County of Riverside (County) inspect the vault, despite representations otherwise. The County and plaintiff's expert testified the vault required a permit. The defendant's expert testified a permit was not required because the vault was "precast, pre-engineered." (*Regalado*, *supra*, 3 Cal.App.5th at pp. 587–588.)

The pool contractor's employees, including the plaintiff, installed the pool equipment in the vault. The plaintiff had never installed a propane heater in a vault. Neither the plaintiff nor his supervisor read the instruction manuals for the spa heater or the propane conversion kit that was used to convert the heater from natural gas to propane. The instruction manuals warned of a risk of explosion if a propane heater was installed in a pit or low spot, where propane gas could potentially collect. (*Regalado*, *supra*, 3 Cal.App.5th at p. 588.) After installation, plaintiff was asked by his supervisor to turn on the pool equipment in preparation for the County's final inspection. The supervisor mistakenly believed the County already had inspected the pressure in the propane line.

The plaintiff entered the vault, bled the propane line until he smelled gas, and, after conferring with his supervisor, turned on the filter pump and heater. As the plaintiff was climbing out of the vault, there was an explosion caused by the residual propane the plaintiff had bled from the line. The plaintiff was thrown into the air, landing outside the vault. He was severely burned and suffered other substantial injuries. (*Regalado*, *supra*, 3 Cal.App.5th at p. 588.)

The plaintiff in *Regalado* sued defendant homeowner for negligence and premises liability, alleging that the defendant negligently installed the underground vault and the

46

unventilated propane heater in that vault. At trial, the plaintiff argued the defendant was liable because the defendant retained control over the project by submitting plans and pulling permits, calling for inspections, furnishing the vault and propane line, and by failing to obtain the necessary permits for the vault and propane line while representing to the pool contractor that he had done so. (*Regalado*, *supra*, 3 Cal.App.5th at pp. 588–589.) The jury found the defendant negligent, assigned 40 percent of fault to him, and the court entered judgment against the defendant in the amount of about $3 million. (*Id.* at p. 586.)

Much like Qualcomm in the instant case, the defendant in *Regalado* argued the jury should have been specifically instructed that, to be liable, the defendant must have " 'affirmatively contributed' " to the plaintiff's injury. (*Regalado*, *supra*, 3 Cal.App.5th at p. 586.) The defendant in *Regalado* thus sought a modification to CACI No. 1009B as follows: " 'An owner-builder owes no duty of care to an employee of a contractor to prevent or correct unsafe procedures or practices. An owner-builder's mere failure to exercise a power to compel the contractor to adopt safer procedures does not, without more, violate any duty. An owner-builder can only be held liable for injuries to the employee of its contractor if the owner-builder affirmatively contributed to the unsafe procedures or practices by direction, induced reliance, or other affirmative conduct.' (Special Instruction No. 2.)

" 'An owner-builder "hirer" who hires an independent contractor to perform work is not liable for a work-related injury suffered by the independent contractor's employee, unless two criteria are met: [¶] (1) the hirer retains the ability to control some aspect of

47

the employee's safety, and [¶] (2) the hirer's retention of control affirmatively contributed to the employee's injuries.' (Special Instruction No. 7.)

" 'Passively permitting an unsafe condition to occur rather than directing it to occur does not constitute affirmative contribution.' (Special Instruction No. 8.)" (*Regalado*, *supra*, 3 Cal.App.5th at pp. 590–591.)

The trial court in *Regalado* refused to give the special instructions regarding "affirmative contribution" proposed by the defendant, and instead gave CACI No. 1009B (modified only by filling in the blanks per that instruction). (*Regalado*, *supra*, 3 Cal.App.5th at pp. 590–591.) Although the defendant agreed that CACI No. 1009B "was an accurate statement of the law" (*Regalado*, at p. 591), he "continued to argue that the court should give an additional instruction that in order for him to be liable, he must have 'affirmatively contributed' to Regalado's injury. [The defendant] focused on Special Instruction No. 8 and urged the court to use that instruction to define 'affirmative contribution' for the jury. The court declined to give the special instruction, reasoning that although it was an accurate statement of the law, the concept was covered by CACI No. 1009B. Specifically, the court noted that CACI No. 1009B required the jury to find that [the defendant] '*negligently exercised* his retained control,' which required affirmative conduct rather than 'just passively allowing something to exist.' " (*Regalado*, at p. 591.)

On appeal, the defendant in *Regalado* claimed that the trial court erred in failing to instruct the jury using his proposed special instructions regarding *Hooker*'s "affirmative contribution" requirement. In rejecting this argument, we first analyzed the *Privette*

48

doctrine, noting that " ' "when employees of independent contractors are injured in the workplace, they cannot sue the party that hired the contractor to do the work. . . . [¶] By hiring an independent contractor, the hirer implicitly delegates to the contractor any tort law duty it owes to the contractor's employees to ensure the safety of the specific workplace that is the subject of the contract." [Citation.] One of the doctrine's underpinnings is the availability of workers' compensation to the injured employee: "[W]hen the person injured by negligently performed contracted work is one of the contractor's own employees, the injury is already compensable under the workers' compensation scheme and therefore the [law] should provide no tort remedy, for those same injuries, against the person who hired the independent contractor." [Citation.] . . . [¶] Thus, subject to certain exceptions, when a general contractor hires a subcontractor, the general contractor is not liable for injuries that occur to the subcontractor's employees.' [Citation.]" (*Regalado*, *supra*, 3 Cal.App.5th at p. 589.)

"One exception is set forth in *Hooker*[, *supra*,] 27 Cal.4th 198 . . . . 'In *Hooker*, the court considered whether the hirer of an independent contractor could be held liable for injuries to the contractor's employee resulting from the contractor's negligence under the theory the hirer retained control of the work but negligently exercised that control. The high court held in *Hooker* "a hirer of an independent contractor was not liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but was liable to such an employee insofar as its exercise of retained control *affirmatively contributed to the employee's injuries*." [Citation.] In such cases, the liability of the hirer is not "vicarious" or "derivative" in the sense that it derives

49

from the act or omission of the hired contractor, but is direct.' [Citation.]" (*Regalado*, *supra*, 3 Cal.App.5th at p. 590.)

Significantly, in *Regalado* we noted that *Hooker* also recognized that "affirmative contribution" could also be by omission: " '[A]ffirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury.' (*Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3.) Further, ' "[a]ffirmative contribution" occurs where a general contractor " 'is actively involved in, or asserts control over, the manner of performance of the contracted work. [Citation.] Such an assertion of control occurs, for example, when the principal employer *directs* that the contracted work be done by use of a certain mode or otherwise interferes with the means and methods by which the work is to be accomplished.' " ' [Citation.]" (*Regalado*, *supra*, 3 Cal.App.5th at p. 590.)

In rejecting the defendant's instructional error argument regarding "affirmative contribution," we found that, although the defendant's special instructions were "drawn directly from case law," the instructions were "somewhat misleading in that they suggest that in order for the hirer to 'affirmatively contribute' to the plaintiff's injuries, the hirer must have engaged in some form of active direction or conduct." (*Regalado*, *supra*, 3 Cal.App.5th at p. 594.) We noted the proposed instructions ignored *Hooker*'s direction that a hirer also could be liable for its omissions. (*Ibid.*)

50

In *Regalado*, we supported our decision that there was no instructional error by relying on the use notes of the Advisory Committee on Civil Jury Instructions (Committee), which state in relevant part:  " 'The hirer's retained control must have "affirmatively contributed" to the plaintiff's injury.  [Citation.]  However, the affirmative contribution need not be active conduct but may be in the form of an omission to act.  [Citation.]  The advisory committee believes that the "affirmative contribution" requirement simply means that there must be causation between the hirer's conduct and the plaintiff's injury.  Because "affirmative contribution" might be construed by a jury to require active conduct rather than a failure to act, the committee believes that its standard "substantial factor" element adequately expresses the "affirmative contribution" requirement.'  (Directions for Use for CACI No. 1009B.)"  (*Regalado*, *supra*, 3 Cal.App.5th at pp. 594–595.)  We thus agreed with the Committee that CACI No. 1009B "adequately cover[ed] the 'affirmative contribution' requirement set forth in *Hooker*."  (*Regalado*, *supra*, 3 Cal.App.5th at p. 595.)

We concluded in *Regalado* there was sufficient evidence to support the jury's findings that the defendant homeowner retained control over safety conditions and exercised that control in a manner that was a substantial factor in causing the plaintiff's injuries.  (*Regalado*, *supra*, 3 Cal.App.5th at p. 597.)  We noted the record in *Regalado* showed that, without obtaining permits for the vault and propane line, the defendant installed the vault, modified its entry and exit point, and ran a propane line that would eventually be connected to the vault.  According to the plaintiff's expert, it was below the standard of care for an owner-builder such as the defendant to fail to obtain permits for

51

the vault and propane line. In the expert's opinion, the failure to adhere to the proper permitting and inspection process was a substantial factor in causing the accident. Based on this and other evidence, we concluded in *Regalado* that a reasonable trier of fact could conclude that the defendant negligently exercised his retained control over safety conditions in a manner that affirmatively contributed to the plaintiff's injuries. (See *id.* at p. 597.)

In reaching our decision in *Regalado*, we recognized that the defendant also presented conflicting evidence on many points, including whether a permit was even necessary given the vault was prefabricated. We noted, however, our task was "not to reweigh the evidence or substitute our judgment for that of the trier of fact. Rather, based on our standard of review, we resolve all conflicts in the evidence in favor of Regalado and give him the benefit of every reasonable inference. [Citation.] Based on that standard and the record before us, there is substantial evidence [in] support of the judgment." (*Regalado*, *supra*, 3 Cal.App.5th at p. 597.)

C. *Analysis*

We agree with the reasoning of, and the conclusion in, *Regalado* that CACI No. 1009B is an accurate statement of the law regarding the "retained control" exception to *Privette* and its progeny, including the requirement in *Hooker* that to be liable under this exception, a defendant must have "affirmatively contributed" to a plaintiff's injury. Like *Regalado*, we read this language to require causation between the hirer's retained control and the plaintiff's resulting injury. (See *Regalado*, *supra*, 3 Cal.App.5th at p. 594; *Traxler*, *supra*, 12 Cal.App.4th at p. 1332.)

52

We conclude the proposed special instructions proffered by Qualcomm regarding "affirmative contribution" were somewhat misleading in that they strongly suggested Qualcomm must have engaged in some sort of "active conduct"—such as being " 'involved in, or assert[ing] control over, the manner of performance of the contracted work,' " or " 'interfer[ing] with the means and methods by which the work [was] to be accomplished' "—in order to be liable under this exception. As noted, however, Qualcomm also could be liable under this exception for its failure to act. (See *Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3; *Regalado*, *supra*, 3 Cal.App.5th at p. 594.)

Turning to CACI No. 1009B and viewing the evidence in the light most favorable to Sandoval (see *Regalado*, *supra*, 3 Cal.App.5th at p. 596), we conclude substantial evidence in the record supports the jury's finding that Qualcomm was liable to Sandoval under the retained control exception to *Privette*. The record shows that Qualcomm owned the property where Sandoval was injured (see CACI No. 1009B) and that it retained control over the safety conditions at the worksite.

As to the latter element, the record shows that Qualcomm, and not TransPower or ROS, conducted the lockout/tagout procedure on several breakers in order for TransPower to conduct its limited inspection of the bus bars in the main cogen breaker generator; that Qualcomm required the TransPower team to witness this procedure and then confirm the main cogen was in fact de-energized; that just prior to the lockout-tagout procedure, Qualcomm held a safety briefing with all of the vendors/contractors on site that day, including TransPower, informing each where they would be working, the scope of their work, and what to do in case of emergency; that a few days before the August 3

53

inspection, Qualcomm employee Bautista sent an e-mail to Redding and Higuera outlining the step-by-step procedures Qualcomm would follow to de-energize the main cogen breaker; that also before the August 3 inspection, Bautista, Potter, and Beckelman conducted "walkthroughs" regarding the sequence of events to shutdown the main cogen breaker; and that, although it was not responsible for the actual inspection of the main cogen breaker, Qualcomm nonetheless remained responsible to ensure the switchgear was in an electronically safe condition before that inspection went forward.

There is also substantial record evidence supporting the jury's finding that Qualcomm negligently exercised retained control over the safety conditions of the inspection. Senior facilities manager Redding testified that senior plant manager Higuera trained Bautista, Potter, and Beckelman to inform *anyone* working in the switchgear room what was hot and what was not hot; that after a lockout/tagout procedure, it was "critical" for members of the Qualcomm team to inform outside vendors what equipment had and had not been de-energized; that such information needed to be given not only to the contractor or subcontractor, but *also* to its respective employees who would be working in the switchgear room; and, thus, that Sandoval (and Guadana and Omid), as opposed just to Sharghi, needed to be specifically told by a member of the Qualcomm team "what is hot and what is not hot," a view also shared by Qualcomm's own expert Loud and by plaintiff's expert Avrit.

Although Beckelman during the safety briefing told everyone, including Sandoval, that certain segments of the switchgear remained energized and later, after the lockout/tagout procedure, used his hand to show Sharghi which breakers remained

54

energized and which were de-energized, there is no record evidence that Beckelman specifically gave Sandoval this information once they were all inside the mezzanine, just prior to TransPower's inspection. We conclude this evidence alone is substantial, supports the jury's finding Qualcomm negligently exercised its retained control over the safety conditions at the worksite, and warranted denial of Qualcomm's JNOV.

But that's not all. The record also shows that the switchgear that was de-energized was located in the same general area as the portion of the switchgear that remained energized; that from the back, the switchgear looked like a "sea of sameness," which Qualcomm's own employees found confusing to navigate; that once Qualcomm de-energized certain breakers, the light panels on those breakers went dark even though they remained energized, making it even more difficult to tell which cells were and were not energized; and that Sandoval's expert, Avrit, opined that when there was "look-alike" equipment such as the switchgear at issue in this case, Qualcomm had a duty under NFPA to post a guard, issue a warning, and/or erect a barricade highlighting the segments of the switchgear that remained energized.

Although Qualcomm presented conflicting evidence showing it allegedly had no duty under NFPA to provide such a warning, or that, even if such a duty existed, it fulfilled that duty when Beckelman used his hand to demonstrate to Sharghi what was live and what was not, just as in *Regalado* we note it is not our role as a court of review to reweigh the evidence or substitute our judgment for that of the trier of fact. (See *Regalado*, *supra*, 5 Cal.App.3d at p. 597.)

55

Next, there clearly is more than sufficient evidence that Sandoval was harmed. (See CACI No. 1009B.) Finally, there is also sufficient evidence to support the jury's finding that Qualcomm's negligent exercise of its retained control over safety conditions at the jobsite was a "substantial factor" in causing Sandoval's harm. The court instructed the jury with CACI No. 430 as follows with respect to this particular element: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct."

The jury also was instructed with a modified version of CACI No. 431 as follows: "A person's negligence may combine with another factor to cause harm. If you find that Qualcomm, TransPower Testing/Frank Sharghi, [ROS's] negligence was a substantial factor in causing Martin Sandoval's harm, then Qualcomm, TransPower Testing/Frank Sharghi, [and] ROS . . . is responsible for the harm. Qualcomm, TransPower Testing/Frank Sharghi, [and] ROS . . . cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing Martin Sandoval's harm."

Here, Sandoval testified he believed, albeit incorrectly, that the entire switchgear had been de-energized. Qualcomm knew otherwise. Given its admission that it owed a duty to anyone working in the switchgear to inform him or her which breakers or portions of the equipment were live and which were not, and given its failure to provide Sandoval such information after the Qualcomm team performed the lockout/tagout procedure on

56

the main cogen breaker, we conclude the record contains more than sufficient evidence to support the jury's finding that Qualcomm's negligent exercise of its retained control over the switchgear safety conditions was a substantial factor in causing the very harm to Sandoval that such a warning could have prevented.

In sum, viewing the evidence in the light most favorable to plaintiff, disregarding conflicting evidence, and drawing all reasonable inferences in his favor, we conclude substantial evidence supports the jury's determination that Qualcomm was liable to Sandoval under the retained control exception to *Privette*. (See *Cabral*, *supra*, 51 Cal.4th at p. 770; *Regalado*, *supra*, 3 Cal.App.5th at pp. 595–597.)[5]

II

SANDOVAL'S CROSS-APPEAL

As noted, the trial court granted Qualcomm's motion for a new trial on the limited ground of excessive damages and in particular, apportionment of fault. We now turn to Sandoval's contention that the trial court erred in granting a limited new trial on this issue. As we explain, we conclude the court properly granted Qualcomm such relief, although, as we discuss, for the wrong reason.

A. *Guiding Principles*

"The standards for reviewing an order granting a new trial are well settled. After authorizing trial courts to grant a new trial on the grounds of '[e]xcessive . . . damages' or

---

[5] For the same reasons, we reject Qualcomm's contention that the case should be remanded for a new trial based on the court's alleged error in refusing to instruct the jury with Qualcomm's "affirmative contribution" special instructions.

57

'[i]nsufficiency of the evidence,' [Code of Civil Procedure] section 657 provides: '[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence . . . or upon the ground of excessive or inadequate damages, . . . such order shall be reversed as to such ground[s] only if there is no substantial basis in the record for any of such reasons.' (Italics [omitted].) Thus, we have held that an order granting a new trial under [Code of Civil Procedure] section 657 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' [Citation.] Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached. . . .' [Citation.] In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' (*Neal* [*v. Farmers Ins. Exchange* (1978)] 21 Cal.3d [910,] 932 [(*Neal*)].)

"The reason for this deference 'is that the trial court, in ruling on [a new trial] motion, sits . . . as an independent trier of fact.' (*Neal, supra,* 21 Cal.3d at p. 933.) Therefore, the trial court's factual determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations. [¶] The trial court sits much closer to the evidence than an appellate court. Even the most comprehensive study of a trial court record cannot replace the immediacy of being present at the trial, watching and hearing as the evidence unfolds. The trial court, therefore, is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts broad

58

discretion to order new trials. The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons. [Citation.]" (*Lane*, *supra*, 22 Cal.4th at pp. 411–412.)

A trial court is required to specify its reasons for granting a new trial. (Code Civ. Proc., § 657 ["When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason for granting the new trial upon each ground stated."].) "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (*Ibid.*) A statement of reasons assists in "promot[ing] judicial deliberation before judicial action" (*Mercer v. Perez* (1968) 68 Cal.2d 104, 113) and in making "the right to appeal from the order more meaningful" (*ibid.*).

B. *Analysis*

The record shows Qualcomm moved for a new trial including, as relevant here, under subdivisions (5) and (6) of Code of Civil Procedure section 657. The court denied Qualcomm's motion under subdivision (6), "insufficiency of the evidence to justify the *verdict or other decision*" (italics added), but granted it under subdivision (5) "excessive or inadequate damages," finding "defendant has established that the damages awarded is erroneous only to the extent it reflects an improper apportionment of liability. As a

result, a new trial is ordered limited to that issue." To support its finding, the court cited the case of *Schelbauer v. Butler Manufacturing* (1984) 35 Cal.3d 442 (*Butler*). The court then went through a detailed summary of the evidence to support its finding there was an improper apportionment of liability.

Despite Sandoval's argument to the contrary, we conclude the trial court complied with the requirement that it state its reason in granting a limited new trial and that its reason was supported by substantial evidence. (See *Lane*, *supra*, 22 Cal.4th at pp. 411–412.) Indeed, the court, sitting as "an independent trier of fact" (*Neal, supra,* 21 Cal.3d at p. 933), cited to evidence that TransPower, along with Sandoval, attended a safety briefing on August 3 before the lockout/tagout procedure; that after Qualcomm completed the lockout/tagout procedure on certain breakers, including the main cogen breaker that was to be inspected, Qualcomm employee Beckelman advised Sharghi what portions of the switchgear remained energized, a fact confirmed by Sharghi; that the TransPower team conducted its own test to ensure the main cogen breaker was in fact de-energized; that when the Qualcomm team left the mezzanine, "there was no live power in any of the open cells in the switchgear room" and thus, "all of the components in the switchgear room could be touched with bare hands because they were either de-energized or covered by a panel"; that TransPower "was aware that[,] other than shutting down the main co-gen cell, the power to the facility would remain live"; that "Sharghi testified that he understood that GF-5 was energized when he had his employee Guadana take the panel off"; that despite "knowing that the other switchgear cells were live, Sharghi, without authorization, instructed his employee to open the panel guarding the live GF-5 circuit

60

breaker"; that "Sharghi never told Qualcomm that he planned to remove the panel[] from the GF-5 circuit or any of the other live circuits"; that the proposal submitted by TransPower referenced only an inspection of the main cogen breaker, which had been racked out; that because "GF-5 was not included within the scope of the work proposed by TransPower," Qualcomm "could not have known that it should de-energize the GF-5 cell" as well; that "Sharghi did not tell Sandoval that the GF-5 circuit was live because Sharghi's only purpose was to take a picture"; and that as a result, after Sandoval inspected the load side bus of the main cogen breaker, he walked to the back of the switchgear and was severely injured when he approached the live, exposed GF-5 circuit.

In addition, the court also noted in support of its order granting a limited new trial that Guadana, at Sharghi's direction, removed the GF-5 cover despite knowledge that doing so was dangerous; that Sharghi "disregarded industry standards" when "he failed to place a barricade or warning sign to prevent someone like Sandoval from triggering an arc flash"; that although Guadana had removed the cover and knew the cell was live, he too "failed to warn Sandoval of the danger—even as he [i.e., Guadana] was shining a flashlight on the electrified bus bars while Sandoval approached GF-5 with his metal tape"; and that "Qualcomm had no reason to think its expert electrical contractor—who had done work on the switchgear 'hundreds of times' [citation]—would go beyond the approved scope of work and expose a live circuit."

On this record, we conclude the trial court properly exercised its discretion when it explained why the apportionment of fault by the jury between Qualcomm and TransPower was "improper."  (See *Lane*, *supra*, 22 Cal.4th at p. 412.)  However, we

61

further conclude the court relied on the wrong subdivision of section 657 of the Code of Civil Procedure to support its decision.

Indeed, the court did *not* find Sandoval's damages were "excessive or inadequate," as set forth in Code Civil Procedure section 657, subdivision (5), when the jury awarded him about $1.094 million in economic loss and $6 million in noneconomic loss.  Rather, in granting the new trial motion, the court found the damages award was "erroneous *only* to the extent it reflects an improper apportionment of liability."  (Italics added.)  It thus appears the court actually relied on subdivision (6) of Code of Civil Procedure section 657 in granting Qualcomm a limited new trial.  The *Butler* case cited by the trial court guides our analysis on this issue.

In *Butler*, a jury verdict was entered in favor of the plaintiff construction worker in a personal injury action, after the plaintiff slipped and fell while installing steel roofing panels manufactured by defendant Butler that were coated in oil.  The defendant moved for a new trial on the grounds of excessive damages and insufficiency of the evidence to support the jury's finding of no contributory negligence.  The trial court conditionally granted the motion; it ordered that the motion would be denied if the plaintiff consented to a 15 percent reduction of the award, to adjust for contributory negligence.  (*Butler*, *supra*, 35 Cal.3d at pp. 448–449.)  The plaintiff consented to the remittitur and the defendant appealed from the judgment and the denial of the motion for new trial.  (*Id.* at p. 449.)

The defendant in *Butler* contended Code of Civil Procedure section 662.5[6] authorized use of a remittitur only when it would be proper for the court to grant a new trial on the issue of damages. Because the trial court used the order to correct the insufficiency of the evidence to justify the jury's apportionment of liability, the defendant contended the trial court abused its discretion. (*Butler*, *supra*, 35 Cal.3d at p. 452.) The *Butler* court agreed, reasoning: "Section 662.5 specifically states that the procedural device of remittitur is to be utilized only when a new trial is warranted solely on the grounds of [inadequate or] excessive damages . . . . [¶] The statutory requirement that use of remittitur be limited to those cases where jury error is confined to the issue of damages is express and unequivocal." (*Butler*, at pp. 452–453.) Accordingly, it found "[a] remittitur may not be used to condition a new trial order if a damage award is excessive only because it reflects an improper apportionment of liability." (*Id.* at p. 454, fn. omitted.)

Key to the instant case, however, the *Butler* court went on to conclude the court's order granting a limited new trial on the apportionment issue was, in any event, proper.

---

6    This statute provides in relevant part: "(a) In any civil action where after trial by jury an order granting a new trial limited to the issue of damages would be proper, the trial court may in its discretion: [¶] (1) If the ground for granting a new trial is inadequate damages, issue a conditional order granting the new trial unless the party against whom the verdict has been rendered consents to the addition of damages in an amount the court in its independent judgment determines from the evidence to be fair and reasonable.
(2) If the ground for granting a new trial is excessive damages, issue a conditional order granting the new trial unless the party in whose favor the verdict has been rendered consents to the reduction of so much thereof as the court in its independent judgment determines from the evidence to be fair and reasonable." (Code Civ. Proc., § 662.5.)

The *Butler* court first looked to the trial court's reason(s) for granting a limited new trial, noting: "the trial court found that there was insufficient evidence to justify the verdict 'with respect to the issues of Plaintiff's contributory negligence and the negligence of Plaintiff's employer . . . .' In the trial court's view, the damages were excessive 'in the sense (*but not otherwise*)' that they reflected the jury's finding of no negligence on the part of [plaintiff] Schelbauer or [his employer] Pre-Fab. (Emphasis [in original].) In its statement of reasons, the court further expressed its opinion that Butler was at least partially liable for Schelbauer's damages by stating that the jury 'clearly should have apportioned fault among plaintiff, the employer and the defendant Butler . . . .' The statement of reasons expressly declared that the damages were excessive 'only in the sense that the error with respect to contributory negligence and the employer's negligence affected the amount of the damages.' [¶] The order clearly indicates that the trial court (1) concurred with the jury's special verdicts that Butler was liable to some extent and that the total damages sustained by Schelbauer were $865,000, and (2) disagreed only with the jury's apportionment of liability.

"Upon review of the evidence, there is ample support for the lower court's conclusion that Butler was liable to some extent for Schelbauer's injuries. The record reflects that the metal panels were covered with enough oil to make them slippery, that the method of affixing the panels to the buildings required workers to walk on them, that Butler did not adequately inspect the panels for excessive oil, and that the panels were sold without any warning cautioning consumers as to their dangerousness.

"There was also sufficient evidence to support the trial court's determination that both Schelbauer and Pre-Fab were also negligent.  In his testimony, Schelbauer admitted that he was fully aware of the thick oil coating on the panels, their resultant slipperiness, and the likelihood that he might fall.  Nonetheless, he took no safety precautions other than walking carefully on the panels. Nor did he request any safety equipment or express to his employer any concern about the danger.

"Similarly, the record shows that Pre-Fab had previous experience with the panels and was well aware of the thick oil coating and of the danger of this condition to employees.  However, Pre-Fab neither wiped the panels nor employed any safety methods to protect its workers from further accidents.  There was testimony that Pre-Fab failed to instruct Schelbauer on a method for fastening the panels to the roof which was safer than the somewhat risky method he learned by imitating fellow workers.

"Also, the record supports the jury's special verdict as to the total amount of damages suffered by Schelbauer.  The damage award was fully supported by the testimony of Schelbauer's expert witness.  The record adequately supports the trial court's determination that the jury properly decided all the issues it addressed with the exception of the apportionment of liability." (*Butler*, *supra*, 35 Cal.3d at pp. 455–457.)

Our high court in *Butler* thus concluded there was "no reason to subject the parties and the courts to the expense and delay of retrial of those issues on which the jury and the trial court agreed and which are supported by the evidence.  Where, as here, the trial court has reviewed the jury's special verdicts and has properly concluded that the jury's apportionment of damages is erroneous but that the damage award is incorrect only to the

65

extent that it reflects an improper apportionment of liability, the trial court should have limited its new trial order to that issue. Accordingly, the new trial order is modified to limit the new trial to the issue of apportionment of liability." (*Butler*, *supra*, 35 Cal.3d at p. 457.) In reaching its decision the *Butler* court relied on Code of Civil Procedure section 43[7] to "modify the trial court's order to provide for a new trial limited to the issue of the proper apportionment of liability." (*Butler*, at p. 458.)

Similar to the circumstances in *Butler*, the new trial order in the instant case shows the damages were excessive " 'in the sense (*but not otherwise*)' that they reflected the jury's finding" (see *Butler*, *supra*, 35 Cal.3d at p. 456) that Qualcomm was 46 percent liable, or 1 percent more liable than TransPower, for plaintiff's injuries. Also like the trial court in *Butler*, the court in the instant case went into detail and cited to substantial evidence—which is borne out by the record—to support its decision to grant Qualcomm a limited new trial on the issue of apportionment of fault.

Following *Butler*, we conclude the court in the instant case properly granted Qualcomm a limited new trial on the issue of apportionment of fault not because the damages were excessive, but because there was insufficient evidence to justify the verdict regarding apportionment of fault. We thus conclude there is "no reason to subject the parties and the courts to the expense and delay of retrial of those issues on which the jury

---

7     This statute provides in relevant part: "The Supreme Court, and the courts of appeal, may affirm, reverse, or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had."

and the trial court agreed and which are supported by the evidence" (see *Butler*, *supra*, 35 Cal.3d at p. 457), including the *amount of damages* the jury awarded Sandoval.

Sandoval nonetheless contends the new trial order was deficient because apportionment could not have been properly evaluated by the trial court because of the alleged dearth of evidence in that order granting a limited new trial regarding Qualcomm's degree of fault. We find this contention unavailing.

The record shows that, while sufficient evidence supports the order denying JNOV based on the finding that Qualcomm negligently exercised retained control of the worksite by failing to warn everybody—including Sandoval—what was live and what was not, after the lockout/tagout procedure had been completed, the evidence, as summarized by the trial court in granting the new trial motion, strongly suggests that TransPower's degree of fault leading to Sandoval's injury was not less than Qualcomm's, even by a mere 1 percent, but rather more than Qualcomm's, as the trial court found in granting Qualcomm relief. (See *O'Kelly v. Willig Freight Lines* (1977) 66 Cal.App.3d 578, 583 [rejecting the defendants' contention that the trial court erred in granting a new trial after finding the evidence did not support the jury's apportionment of fault of 50 percent to the plaintiff and 50 percent to the defendants when the evidence showed that the defendant was more at fault than the plaintiff, as the plaintiff merely "pulled up and stopped her car parallel and close to the curb, that her car was struck from behind by defendant Wade and moved ten to twelve feet forward, and that immediately after the accident the defendant Wade said in substance, 'I'm sorry. It was my fault"].)

Here, we conclude the trial court provided this court with sufficient information "to enable [us] to review in a meaningful way the order granting the new trial." (See *Aronowicz v. Nalley's, Inc.* (1972) 30 Cal.App.3d 27, 38; see also *Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 367, 370 [noting that to "comply with [Code of Civil Procedure] section 657 'the trial judge is not necessarily required to cite page and line of the record, or discuss the testimony of particular witnesses,' nor need he [or she] undertake 'a discussion of the weight to be given, and the inferences to be drawn from each item of evidence supporting, or impeaching, the judgment,' " but that the "trial judge [is required] to briefly identify the deficiencies he [or she] finds in 'the evidence' or 'the record' or [citation] 'the proof'—rather than merely in 'the issues' or 'the ultimate facts' "].)

## DISPOSITION

The order denying Qualcomm's JNOV is affirmed. The order granting Qualcomm's new trial motion on the limited issue of apportionment of fault is

affirmed, but under subdivision (6) of Code of Civil Procedure section 657.  In the interests of justice, the parties are to bear their own costs on appeal.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.